## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

| | | |
|---|---|---|
| BENJAMIN ALLEN, | ) | |
| | ) | |
|     Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. _____ |
| | ) | |
| MIDDLE TENNESSEE SCHOOL | ) | |
| OF ANESTHESIA, INC. | ) | JURY DEMAND |
| | ) | |
| | ) | INJUNCTIVE RELIEF |
| | ) | |
|     Defendant. | ) | |

## VERIFIED COMPLAINT

Plaintiff Benjamin Allen, by and through counsel, brings this action under the Americans with Disabilities Act, 42 U.S.C. § 12101, *et seq.,* and the Rehabilitation  Act of 1973, 29 U.S.C. §  701, et seq. against the Defendant Middle Tennessee School of Anesthesia, Inc. for improper dismissal of Mr. Allen from its Doctorate of Nurse Anesthesia Program. Plaintiff also asserts causes of action under state law and invokes this Court's supplemental jurisdiction.  In addition, Plaintiff files this suit for injunctive relief, including preliminary and final injunctive relief and money damages against Defendant.

### PARTIES

1.    Plaintiff, Benjamin Allen, is currently residing in Hendersonville, Tennessee.  At all times relevant to this Complaint, Plaintiff was a student in the Doctor of Nursing Anesthesia Practice ("DNAP") program at Middle Tennessee School of Anesthesia.

2. Defendant Middle Tennessee School of Anesthesia, Inc. ("MTSA") teaches and trains Registered Nurses to become Certified Registered Nurse Anesthetists. MTSA operates, runs, and manages a private graduate school program and accepts federal funding. MTSA is a Tennessee non-profit corporation affiliated with the Seventh-day Adventist Church. Its principal place of business is 315 Hospital Drive, Madison, Tennessee 37115-5030. The Defendant's registered agent for service of process is listed as Middle Tennessee School of Anesthesia, Inc., 315 Hospital Drive, Madison, Tennessee 37115-5030.

## JURISDICTION

3. The jurisdiction of this Court is invoked pursuant to 28 U.S.C. § 1331, which gives district courts jurisdiction over all civil actions arising under the Constitution, laws, and treaties of the United States of America. The federal claims arise under specifically Title III of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.,* and the Rehabilitation Act of 1973, 29 U.S.C. § 701, *et seq*.

4. The Court has supplemental jurisdiction over the Tennessee state law claims and should exercise jurisdiction pursuant to 28 U.S.C. § 1367 for the following reasons:

  a. The action for violations of the federal laws set forth in Paragraph 3, herein, namely: the American with Disabilities Act, 42 U.S.C. Section 12101,*et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 701*, et seq*., and jurisdiction for these actions are conferred on the Court by 28 U.S.C. § 1331.

b. The State law claims, breach of contract, express or implied and breach of the covenant of good faith and fair dealing are so related to the claim in the federal causes of action that the claims form part of the same case or controversy under Article III of the Constitution.

c. The State cause of action neither raises a novel or complex issue of state law nor substantially predominates over the federal claims.

d. There are no other compelling reasons for the Court to decline jurisdiction over the state law claims.

e. The state law claims, breach of contract, express or implied and breach of the covenant of good faith and fair dealing are so related to the claims in the federal causes of action that the claims form part of the same case or controversy under Article III of the Constitution.

f. There are no other compelling reasons for the Court to decline jurisdiction over the state law claims.

## VENUE

5. Venue lies in this Court under 28 U.S.C. § 1391(b)(1)&(2). Plaintiff seeks injunctive relief under the American with Disabilities Act, 42 U.S.C. § 12101, *et seq.*, the Rehabilitation Act of 1973, 29 U.S.C. § 701*, et al*. Venue for such actions lies in "any court of the United States having jurisdiction over the parties."

## FACTS

### Benjamin Allen's Background & Admission to MTSA

6. In 2000, while in the first grade, Mr. Allen was diagnosed with ADHD with anxiety and remained under the care of a child and adolescent psychologist

throughout high school. Since turning eighteen, he has received treated by his primary care physician. Mr. Allen has continuously taken prescribed medication for ADHD and anxiety since his initial diagnosis. In addition to taking prescribed medications, Mr. Allen successfully developed a visual learning style ("hands on") method.

7.    In 2015, Benjamin Allen graduated from Middle Georgia State University with the academic degree of Bachelor of Science in Nursing, ranking near the top of his undergraduate class.

8.    Mr. Allen successfully passed the licensure examination and was licensed as a Registered Nurse. As an R.N., he worked as a Critical Care Nurse both in a Neuro-Intensive Care unit and in a Cardiovascular Intensive Care unit, providing first-rate nursing care for the patients under his watch.

9.    In 2017, Mr. Allen applied for and was admitted to the doctoral program at MTSA ("DNAP") to become a Certified Registered Nurse Anesthetist ("CRNA"). He began the program in January 2018.

10.    Over the course of five (5) semesters, Mr. Allen earned a grade point average at MTSA of 3.69, a GPA demonstrating his mastery of the academic subjects offered and taught at MTSA. In short, academically, there is no doubt that he has learned the material in the coursework that MTSA requires.

## Mr. Allen's Disabilities and MTSA's Actual Knowledge About His Disabilities

11.    Due to MTSA's drug testing policy, Mr. Allen provided Lynn Ray at MTSA a copy of his prescription bottle for Ritalin, which he took three times a day

for ADHD with anxiety. When his prescription changed to Vyvanse for ADHD with anxiety, he provided that information to Ms. Ray.

12.     Despite Mr. Allen's excellent course grades, he began to struggle in the clinical rotations due to his ADHD and anxiety.  He informed faculty on various occasions that he needed remediation and accommodations but received none. Remediation in part was through the SIM lab; however, the SIM lab was locked, and students could not access without faculty permission.  Being a visual learner, Mr. Allen continued to request time in the SIM lab for "hands on" practice but was not granted time in the SIM lab.

13.     On or about June 23, 2018, Mr. Allen informed his mentor in the DNAP program, Dr. Rusty Gentry, the Program Administrator that he suffered from ADHD and requested assistance and accommodations. This would not be the last time Mr. Allen requested assistance from Dr. Gentry, his mentor.

14.     During the 2018 summer semester through the Spring semester of 2019, Mr. Allen sought accommodations or remediation from Leigh Taylor, the Assistant Program Administrator to Dr. Gentry.  He specifically informed her of his disability that his learning style was visual.

15.     Again, in October 2019, Mr. Allen sought accommodations or remediation and extra time for the SIM lab rotation and otherwise.  Dr. Gentry sent an email confirming that Mr. Allen would receive the requested assistance, but the assistance promised in the SIM lab never materialized.

16. On or about March 14, 2019, Mr. Allen requested accommodations or assistance from Dr. Gentry for his ADHD and anxiety, and nothing was done by Dr. Gentry or the school.

17. Dr. Gentry, by email to Mr. Allen, dated October 23, 2019, wrote:

> As you are aware, your next rotation is scheduled to be in the Lab. During the simulation rotation, I will **arrange time for remediation** while on campus to work on your clinical deficiencies.

18. By the fall of 2019, Mr. Allen's need for accommodations and remediation became more pronounced as he began his pediatric clinical rotation. He lost twenty-five pounds in quick fashion. He was referred by MTSA Assistant Program Administrator Leigh Taylor to the Babb Center and attended three free sessions with the L.S.C.W. Yeiser. However, he did not receive accommodations or remediation for the coursework/clinicals, which would be additional SIM labs.

**MTSA lack of Support for Students with Disabilities**

19. MTSA's "**NONDISCRIMINATORY POLICY**" plainly states that it does not discriminate against students with disabilities and will provide reasonable accommodation for them. In pertinent part, the policy states:

> MTSA admits students without regard to … disability … to all privileges, programs, and activities, generally accorded … to students at the School …. It **does not discriminate** on the basis of … **disability** … in administration of its educational policies, admission policies … or any other School-administered program. The School will make **reasonable accommodation wherever necessary** for all applicants with disabilities …. (emphasis added)

20. The Catalog & Handbook simply states that if a student believes his rights under the American With Disabilities Act or Section 504 of the Rehabilitation Act "have been violated" then he "should the Office of MTSA Dean." No verb is

inserted between the word "should" and the phrase, "the Office." The Catalog & Handbook is silent as to how a student is to inform the School or formally request accommodations. Mr. Allen in fact told faculty and staff at the appropriate Office about his disabilities but no action or accommodation was forthcoming.

21.    Compared to other institutions, public and private, MTSA's lack of guidance to students with disabilities falls well short of the law's requirements and those of other similar institutions. *See* Lincoln Memorial University's policies (on-line); Union University's policies (on-line); University of Tennessee Chattanooga's policies (on-line); and University of Tennessee Memphis Health Sciences Center (on-line).

22.    Each of these institutions have in place a specific ADA coordinator or similarly titled individual, provide specific guidance to students with disabilities, and instruct students as to how to access them.

## Senior Year Clinical Rotations

23.    During the Fall of 2019, Mr. Allen began his sixth (6th) semester. In semesters 6-9, the class loads decrease, and the clinical expectations increase. Students participate in specialty rotations (*i.e.* cardiovascular, pediatrics and obstetrics).

24.    MTSA has developed a "card system" to assist in the evaluation process of all students at all levels. "Yellow" cards are given when there is an "area needing improvement." "Red" cards are given to a student when there is a "critical incident," and the student's level of performance is below acceptable levels for this stage of the program. Receipt of a red card can lead to probation, suspension, or in

extreme cases to termination from the program. Both yellow and red cards are reviewed by the Progressions Committee to access the progress of the student and recommend remediation, probation, suspension, or dismissal.

25.     Mr. Allen often received positive feedback on evaluations for his clinical work. Evaluations are typically written and provided to the Student on the date of a rotation or immediately after a student performs in the clinical setting. For instance, in their evaluations, CRNAs and Anesthesiologists observed Mr. Allen and noted:

> a.  Ben is a *great team player*.
>
> b.  Ben eagerly assisted me with pre-op's.  He communicated appropriately and asked appropriate questions.  Ben was *professional* …
>
> c.   no big deficits noted … continues to be more and more vigilant.
>
> d.   great job with challenging cases – first day in GI lab – *good judgment*, listened well – asked good questions; close attention to procedures.
>
> e.  Ben is awesome – follows directions well, great hands, a total pleasure to work with.  *Easily functions at the level of a CRNA* (Pilla, M.D.).
>
> f.  *very prepared* – called the CRNA and Attending the night before and came up with plans, then verified plans throughout the day … got all intubations on the first attempt.
>
> g.  *well received* … families and patients, over and over again. Benjamin's *performance* in this area is far *above his colleagues* … [he] is always eager to learn and receive feedback throughout the day (Hughes, M.D.).
>
> h.  Ben *did great* today! Did both cases independently!
>
> i.  Attentive to patient. Vigilant.  Makes *good decisions*.

j. *follows* recommendations and suggestions well.

k.  takes constructive criticism well (Leeper, CRNA).

l.  Ben provided effective bedside care.

m.... *Good attitude*

n.  very *knowledgeable* in collaborating with this plan!

o.  Pulled Benjamin off breaks to jump in and help on one of my GA cases … did a great job and was *eager to work*, I sat in the chair and he did case from stem to stern (Freehling, CRNA).

p.  *A+ attitude* and effort *volunteering* to jump into a case at the last minute (Freehling, CRNA).

q.  No obvious weakness noted ... took ownership of his case … Overall, great job today.

r.  Though Ben] continues to need guidance from CRNAs, … I really wish he would have come to a very difficult rotation later in his senior year.  [Should not place students] alphabetically … in their specialty rotations … (Frankenfield, CRNA).

s.  Receptive to instruction and feedback (Leeper, CRNA).

26.     On October 22, 2019, Mr. Allen received a "red card," but it was changed to a "yellow" card during his pediatric clinical.  He was informed that he "needs improvement."  Without input from Mr. Allen, the Progressions Committee reviewed the yellow card incident and placed Mr. Allen on probation during the remainder of his pediatric rotation.

27.     In the span of February 28 -- March 30, 2020, Mr. Allen was quarantined following his abbreviated honeymoon from Greece due to the COVID 19 pandemic.   Due to the virus, clinicals were not available for students until the end of April 2020.

28.     On April 21, 2020, the Progressions Committee met to discuss Mr. Allen's probationary status and determined that he had performed all the requests made of him and informed by letter dated April 22, 2020, that his probationary period had been completed.

29.     Dr. Maria Overstreet, the Chair of the Progressions Committee ended the  April 22, 2020 letter to  Mr. Allen as follows:  "I look forward to your continued progress and encourage you to remain steadfast in your discussions with your mentor to remain successful in the program."

30.     On May 1, 2020, Mr. Allen emailed Dr. Gentry requesting assistance and stated in part his concern with a recent placement at Vanderbilt since "having not been in clinical for two months [honeymoon and covid-19 quarantine], as this is much longer than many of my colleagues, I do not feel as if I would be gaining adequate structure nor experience just coming off of Clinical Probation . . . would you please let me know next steps in order to be successful in this next season of returning to clinical."

31.     Once again, Mr. Allen reached out to his mentor Dr. Gentry whose only guidance early on at MTSA had been to "study harder" despite being asked by Mr. Allen repeatedly for remediation and accommodation for his ADHD and anxiety.

32.     On June 8, 2020, only three days into his OB clinical rotation, Mr. Allen received a "red card." The actual negative evaluation was not written up until June 14, 2020.

33.   On June 22, 2020, Mr. Allen was notified via email that the Progressions Committee would be holding a virtual hearing to meet to review his progression.

## The June Progressions Committee Meeting

34.   The Progressions Committee was the MTSA body that purported to hold a hearing resulting in Mr. Allen's dismissal.

35.   On June 22, 2020, Mr. Allen received an email informing him the Progressions Committee meeting would be meeting the following day via video conferencing to review presumably his recent OB incident.  The "notice" was vague, and Mr. Allen did not know what to expect.

36.   At the hearing, the Progressions Committee selectively used negative evaluations to purportedly justify its erroneous decision.  To Mr. Allen's surprise, a negative evaluation from six (6) months beforehand, or December 2019, from a different clinical rotation was included; however, evaluations are supposed to be provided on the day of the clinical rotation itself and not six months after the fact. The reason that evaluations are to be provided at the time of the clinical rotation is so that that any issues can be corrected. A six months late evaluation is at odds with this purpose.

37.   The Progressions Committee also included the "red" card incident issued following a June 8th clinical day in his OB clinical.  The evaluation was dated June 14, 2020, which carried the possibility of his being placed on a second probation.  This evaluation was submitted nearly a week after the alleged incident.

38.    Mr. Allen had successfully completed his probation concerning his pediatrics rotation in April 2020.  Then, there was no further mention of this December 2019 negative evaluation, and yet, six months after the fact, it was submitted on-line for presentation to the Progressions Committee.

39.    The hearing failed to afford minimal due process protections to Mr. Allen and failed to afford him a fair and unbiased hearing.

**Erroneous and Incorrect Statements made at the Hearing outside the presence of Mr. Allen severely prejudiced Mr. Allen who was not afforded the opportunity to rebut the false and misleading statements**

40.    At the hearing, the Progressions Committee accepted as true and accurate statements that were incorrect, erroneous or false made by several faculty members.  These statements prejudiced Mr. Allen.

41.    At the hearing, Mr. Allen was not permitted to hear their statements, much less contest, challenge or rebut them.

42.    Jackie Woodruff, OB CRNA Clinical Lead at Vanderbilt, wrongly and erroneously stated that Mr. Allen had a full day of orientation in OB explaining differences in epidurals and spinals as well as the reasons and rationales and techniques for both.

43.    If Mr. Allen had been allowed to hear Woodruff's statement, he would have refuted her erroneous statement. Although epidural placement is supposed to be presented on Day 1 of OB orientation, it was not.  Plaintiff was prejudiced because he was not given the opportunity and necessary instructions to perform the procedures.

44.     The Progressions Committee did not consider a positive OB evaluation of Mr. Allen dated June 15, 2020.  CRNA Dustin Hamblen wrote in his June 15th evaluation about Mr. Allen: "Overall, Ben showed improvement with an overall willingness to and eagerness to enhance his OB experience."

45.     Vanderbilt CRNA Hamblen asked what Mr. Allen's learning style was and understood that he was a visual learner.  Accordingly, Hamblen used the "teach back" method to both correct and train Mr. Allen.  In "teach back," the student teaches the teacher the technique step by step.  If there is a deficiency in the "teach back," the teacher corrects it.

46.     At the hearing, Dr. Gentry tipped his hand early.  He recommended dismissal as opposed to probation. To support his recommendation, Dr. Gentry stated that Mr. Allen had not completed the requirements of probation.

47.     Mr. Allen's probation however had been lifted in April 2020.  A letter from the Progressions Committee stated that he had satisfied the conditions of his probation. This lifting of probation is identical to that which Mr. Allen pointed out to Dr. Gentry by an email dated May 1, 2020.

48.     These critical misstatements were material to the decision to dismiss Mr. Allen.

49.     Mr. Allen was punished for acts where he was not given the orientation and instructions and was reprimanded for not following or complying with policies or procedures that were never given, much less explained to him.

50.     During the hearing, Mr. Allen never was given the opportunity to hear the false or misleading statements and never had the opportunity to challenge Woodruff or Dr. Gentry or rebut the statements.

51.     The reason he could not challenge Woodruff or others is clear and troubling: The incorrect and untrue statements were made when Mr. Allen was NOT allowed to hear Woodruff and Dr. Gentry as they spoke.  He only learned about their incorrect or false statements after the hearing and upon listening to the recording of the hearing.

52.     Defendant MTSA notified Mr. Allen by a letter dated June 24, 2020, that he was being dismissed from the DNAP based on the June 23, 2020 Progressions Committee meeting.  The stated reason for dismissal listed unsafe clinical performance.  Dr. Gentry played a key role during the hearing on the Appeal.

53.     On July 1, 2020, Mr. Allen appealed his dismissal to the MTSA Appeals Committee.

54.     Later that month, Mr. Allen was notified that the MTSA Appeals Committee affirmed the dismissal.

**COUNT I**
**Violations of Title III of the American with Disabilities Act**

55.     Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully stated herein.

56. Title III of the American with Disabilities Act of 1990 ("ADA"), 42 U.S.C. §12101 *et seq.*, is a civil rights law that prohibits discrimination based on disability.

57. Pursuant to 42 U.S.C. § 12182(a), MTSA cannot discriminate against Mr. Allen "on the basis of disability."

58. MTSA is a private entity under the ADA, 42 U.S.C. § 12181 (7)(J) and is subject to Title II of the ADA.

59. The ADA bars educational discrimination against "qualified individuals with disabilities." The ADA prohibits MTSA from discriminating against persons with disabilities. 42 U.S.C. § 12182.

60. Title II of the ADA applies specifically to educational institutions, including MTSA, and requires it to make educational opportunities, extracurricular activities, and facilities open and accessible to all students.

61. Pursuant to 42 U.S.C. § 12182(b)(2)(A)(ii), discrimination includes failing to make "reasonable modifications in policies, practices, or procedures" to accommodate Mr. Allen, unless the modifications would "fundamentally alter the nature" of the course requirements.

62. Mr. Allen is a person with a disability. 42 U.S.C. § 12102. He suffers from a mental impairment or impairments that substantially limit one or more major life activities or he has a record of such an impairment or is regarded as having an impairment or disability. 42 U.S.C. § 12102. Thus, he is a qualified individual with a disability.

63.     Mr. Allen suffers from ADHD and anxiety which are specific learning disabilities that affect his ability to concentrate and cause him to be distracted, and his anxiety disorder affects his ability to learn.

64.     Despite making repeated request for remediation and accommodations, MTSA violated the ADA by failing to grant Mr. Allen's requested accommodations. The ADA likewise requires MTSA to offer reasonable accommodations to Mr. Allen.

65.     MTSA however not only did not give any requested accommodations but failed to have a program in place for students with disabilities.  In sum and substance, MTSA has run afoul of the ADA.

66.     As a result of MTSA's violation of the ADA, Mr. Allen:

a.      has suffered substantial harm due to his disability in the form of negative clinical evaluations that escalated to receiving his first probation and then dismissal from the program.

b.      has suffered substantial harm regarding –

(i) the reality that he cannot become a CRNA or obtain a DNAP due to the dismissal;

(ii) incurring significant monetary (due to school debt incurred and loss of anticipated CRNA salary) and emotional damages as a result of MTSA's violations.

67.     The ADA has no exemption from the statutes' reach for MTSA.

68.     Federal disability laws provide for substantial relief, including injunctions, monetary damages, and payment of attorney's fees to the prevailing party.

**COUNT II**
**Violation of Section 504 of the Rehabilitation Act of 1973**

69.     Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

70.     Like the ADA, Section 504 of the Rehabilitation Act prohibits a federally funded program from discrimination against an "otherwise qualified individual with a disability" because of his disability.

71.     Pursuant to 29 U.S.C. § 794(a), Mr. Allen is an "otherwise qualified individual with a disability." Like the ADA, Section 504 carries its own remedies.

72.     There is a direct causal link between MTSA's failure to grant Mr. Allen's requested accommodations and his clinical rotation difficulties.

## COUNT III
## <u>Due Process Violations</u>

73.     As set forth by its own policies or procedures, MTSA was required to provide due process to Plaintiff Mr. Allen.

74.     MTSA failed to provide due process, which includes a fair hearing for Mr. Allen.  MTSA however did not follow basic rules attendant with due process and a fair hearing.  Due process commands that the School provide a student with the charges against him before a hearing.

75.     The June 22, 2020 email "notice" was so vague it failed to meet minimum notice requirements.

76.     It was not until after the hearing concluded that Mr. Allen learned about the charges presented against him, and then only by listening to the recording of the hearing.

77.     Mr. Allen was never allowed to hear his principal accuser. Accordingly, he could not prepare to defend himself, a reality compounded by the fact that he was given less than one day's "notice" about the date of the hearing.

78.     Due process demands that a student be able to challenge or rebut false or incorrect statements made by his accusers. No such opportunity was offered or provided. Mr. Allen never heard his accuser until he heard the false statements in a recording obtained after the hearing concluded. Information used at the Progressions Committee was not provided to Mr. Allen.

79.     The Progressions Committee members seemed to have consulted with each other or else decided the outcome before the hearing. One Committee member Dr. Leigh Taylor texted Mr. Allen minutes prior to the hearing, stating, "No matter what happens this evening, I am praying for you …" A second Committee member Dr. Gentry, his mentor, texted him hours before the hearing, "I know today [day of hearing] is a difficult day … Whatever happens. …you are a bright light, and have a heart of gold." Dr. Gentry apparently was in charge of the Committee hearing.

80.     These texts suggest that the decision-makers had already conferred or decided the issue prior to the hearing where the result was dismissal from the program. A fair and impartial hearing requires neutral, unbiased decision-makers who do not decide a student's fate prior to a fair hearing.

81.     Moreover, a highly negative evaluation was provided on June 3, 2020 for a rotation done on some unknown days in December 2019 and a second dated June 14, 2020 for a rotation on June 6, 2020. These evaluations have the appearance of being created in part to justify the dismissal. In short, it appears

that MTSA decision-makers had decided Mr. Allen's fate (dismissal) and were shoring up or justifying their decision prior to the hearing. It is unusual and out of the ordinary that these late evaluations suddenly appeared, out of the proverbial blue, close in time to the hearing.

82.     The deprivation and harms resulting from the hearing are serious for Mr. Allen. His debts are in the six figures and he has sacrificed financially and otherwise to attend MTSA. When the deprivation is substantial, at a minimum, due process requires fair and open procedures designed to allow the student to challenge or rebut his accusers, requires sufficient time to prepare, and requires neutral decision makers. MTSA's procedures did not meet these minimum standards.

## COUNT IV
## Breach of Contract Implied and Express

83.     Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

84.     Mr. Allen's relationship with MTSA is contractual in nature, both express and implied.

85.     Pursuant to Mr. Allen's contract with MTSA, MTSA agreed, among other things:

    a.      to provide Mr. Allen with academic instruction and training leading to becoming a CRNA;

    b.      to consider his requests for accommodations pursuant to federal law in a timely manner;

c.    to follow the provisions of the MTSA handbook and student policies in a fundamentally fair manner; and

d.    to treat Mr. Allen with fundamental fairness and equity without penalty or bias because of his disability.

86.    As consideration for the contract, Mr. Allen paid money to MTSA as tuition.

87.    MTSA breached its contractual commitment to Mr. Allen:

a.    by failing to provide him with timely accommodations for clinical rotations as required by the ADA; and

b.    by requiring him to participate in elective clinicals without requested lab simulations, the requested remediation accommodation.

88.    MTSA also breached its contractual commitment to Mr. Allen:

a.    by ineffectively investigating the evaluations that formed the basis for his dismissal and selectively presented only negative evaluations;

b.    by failing to provide an unbiased and neutral panel to sit on the Progressions Committee;

c.    by having a virtual hearing that was fundamentally unfair and led to him wrongfully being dismissed from the DNAP program; and

d.    by having an appeal process that clearly failed to address the appeal issues raised by Mr. Allen through counsel submitted July 1, 2020.

89.    Mr. Allen relied, to his detriment, on MTSA's promise of a fundamentally fair Progressions Committee June 23, 2020 hearing.

90.    MTSA's "notice" of hearing dated June 22, 2020, sent via email to Mr. Allen cannot form the basis for its dismissal ruling the following day.

91.     MTSA's appeal process cannot form the basis for upholding the dismissal.

92.     As a result of MTSA's breach of contract, Mr. Allen:

    a.      has suffered substantial harm, including irreparable harm to his professional reputation and detriment to future educational and employment opportunities,

    b.      has also incurred significant monetary and emotional damages as a result of MTSA's breach of contract.

## COUNT IV
## Breach of Implied Covenant of Good Faith and Fair Dealing

93.      Plaintiff refers to and incorporates each of the foregoing paragraphs as if fully restated herein.

94.      MTSA did not deal fairly, equitably, and in good faith with Mr. Allen.

95.     Mr. Allen has suffered harm as a result of MTSA's violation of its obligations under the implied covenant of good faith and fair dealing/obligation of good faith performance.

96.     As a result of MTSA's breach of covenants of good faith and fair dealing, Mr. Allen:

    a.      has suffered substantial harm, including irreparable harm in the form of destruction of his professional reputation and detriment to future career as a CRNA and employment opportunities; and

    b.      has also incurred significant monetary damages as a result of MTSA's breach of the covenant.

## INJUNCTIVE RELIEF

97.     Plaintiff requests that the Court enter a preliminary injunction and after trial, a permanent injunction.

98.     Absent the Court granting Plaintiff a preliminary injunction, the following will result:

   a.    Plaintiff is suffering and will likely suffer immediate and irreparable harm if a preliminary injunction is not granted before a decision on the merits is reached: he will not be able to complete his DNAP program, since transfer is not an option due to being wrongfully being dismissed from MTSA.

   b.    Plaintiff has a likelihood or strong likelihood of success on the merits;

   c.    The balance of hardships for granting an injunction tips in favor of Plaintiff; and

   d.    Plaintiff further has met the requirements for a permanent injunction after a trial on the merits.

## JURY DEMAND

99.     Plaintiff demands a trial by jury of his peers for all issues triable by a jury.

## PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Plaintiff prays for the following relief:

1.     For process to issue and that the Defendant be served.

2.     To find MTSA liable for each of the Causes of Action discussed above;

3.     For the Court to issue a Preliminary Injunction ordering the Defendant:

      a.      to reverse the dismissal and readmit Mr. Allen into the DNAP program;

      b.      to follow the requirements of federal disability law for Mr. Allen;

4.      For the jury or the Court to award compensatory damages of One Million Dollars ($1,000,000.00) to Plaintiff for the costs, including tuition, fees and other related costs, associated with Plaintiff's attendance at MTSA; MTSA's damage to his professional reputation, the detriment to Plaintiff's future employment opportunities; and the emotional damages directly and proximately caused by Defendant's action;

5.      For an order directing MTSA to pay reasonable attorneys' fees and costs incurred by Mr. Allen;

6.      For a jury to hear and decide all issues that a jury may hear and decide;

7.      For the Court to expedite the case on its docket; and

8.      For other relief as the law and justice permit and the Court deems appropriate to vindicate Plaintiff's rights.

Respectfully submitted,

/s/Perry A. Craft
Perry A. Craft, BPR # 006056
LAW OFFICE OF PERRY A. CRAFT, PLLC
402 BNA Drive, Building 100, Suite 202
Nashville, Tennessee 37217
Telephone (615) 953-3808
Facsimile: (615) 739-6292
Email: perrycraft@craftlegal.com

Dated this 20th day of October 2020.

**VERIFICATION**

I, Benjamin Allen, having taken an oath, declare under penalty of perjury as follows:

1.  I am over the age of eighteen (18) and competent to testify in this Matter.

2.  The facts state in this Verified Complaint are true and correct.

_____
Benjamin Allen

.