| | | |
|---|---|---|
| BENJAMIN ALLEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 3:20-cv-00903 |
| | ) | Judge Aleta A. Trauger |
| | ) | |
| MIDDLE TENNESSEE SCHOOL OF | ) | |
| ANESTHESIA, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

Middle Tennessee School of Anesthesia, Inc. ("MTSA") has filed a Motion for Summary Judgment (Doc. No. 33), to which Benjamin Allen has filed a Response (Doc. No. 37), and MTSA has filed a Reply (Doc. No. 41). For the reasons set out herein, the motion will be granted.

## I. BACKGROUND

### I. Allen's Enrollment, Performance, Dismissal, and Lawsuit

On January 18, 2018, Allen, who has been diagnosed with attention-deficit/hyperactivity disorder ("ADHD"), enrolled in MTSA's Doctorate of Nurse Anesthesia Practice Program. (Doc. No. 38 ¶¶ 1–2.) The parties do not dispute the validity of Allen's diagnosis or the fact that ADHD affects him in a number of ways, including by resulting in "distractedness, impulsivity, lack of awareness, . . . fidgeting, excessive talking, and forgetfulness." (Doc. No. 42 ¶ 1.) Allen takes medication for ADHD that makes his symptoms, on the whole, more manageable, but the medications also exacerbate his anxiety. (*Id.* ¶¶ 2–3.) Although it is not clear how widely Allen's diagnosis was known within MTSA, the institution was, at least to some degree, informed of its

existence. For example, as part of Allen's entry into the program, he provided information for a "Health History Form" that included the fact that he was on a prescribed daily dose of Ritalin SR, an ADHD medication. (Doc. No. 38 ¶ 3.) MTSA Program Director Dr. Russell Gentry also testified, during his deposition, that Allen told him of his ADHD diagnosis at some point. (Doc. No. 35-2 at 66.) MTSA Assistant Program Director Dr. Leigh Taylor testified that Allen informed her of his diagnosis as well and that she discussed issues related to mental health with Allen in the context of Allen's difficulties with the program. It is not clear from the testimony, however, how much Dr. Taylor connected Allen's struggles, which were focused on "stress and coping strategies," with the ADHD diagnosis. (Doc. No. 35-4 at 40, 90; Doc. No. 42 ¶ 17.)

MTSA's program includes both a "classroom/academic" component and a "clinical" component. (Doc. No. 38 ¶ 4.) In October 2019, Allen participated in a pediatric clinical rotation at Vanderbilt University Medical Center ("VUMC"). (*Id.* ¶ 9.) On October 2, 2019, Allen sent an email to Dr. Taylor, warning Dr. Taylor that she would likely soon hear from the certified registered nurse anesthetist ("CRNA") overseeing the VUMC rotation, Laura Payne, informing Dr. Taylor that Allen was having difficulties with the rotation. (*Id.* ¶¶ 10–11.) Allen told Dr. Taylor, "I know that I can do this but I just need some help and someone to talk to about it." (*Id.* ¶¶ 10–11.)

As predicted, Payne emailed Dr. Taylor the following day, detailing issues with Allen's performance. (*Id.* ¶ 12.) Payne also issued Allen a "red card for his clinical performance," although she later revised it to a "yellow card." (*Id.* ¶ 14.) According to MTSA's 2020 Student Handbook, a red card indicated that "the student's level of performance is below that level acceptable for [his] stage in the program . . . and that the performance could or would have caused significant morbidity or mortality without intervention," whereas a yellow card indicated

only that "a student's performance may not be quite as advanced as the instructor feels it should be for the student's level in the program." (*Id.* ¶ 46.)

Other CRNAs at VUMC also expressed concerns about Allen over the course of the coming month. On October 14, 2019, CRNA Heather Frankenfield sent Payne an email wondering whether Allen was "safe" and expressing concern that he might fail to recognize signs of a patient's deteriorating. (*Id.* ¶ 16.) On October 17, 2019, CRNA Lara Craig sent Payne an email describing Allen as "not someone that I feel comfortable with caring for any patient independently," as well as "incredibly far behind his peers" and a "major safety concern." (*Id.* ¶ 17.) On October 21, 2019, CRNA Patricia D. Juoza-Clark sent Payne an email describing an incident during which, in Juoza-Clark's opinion, Allen had failed to recognize that a patient was not breathing. (*Id.* ¶ 18)

On October 23, 2019, Dr. Gentry sent Allen an email informing him that he was being placed on probation due to his "recurring clinical deficiencies" while at VUMC. (*Id.* ¶ 19.) Dr. Gentry informed Allen that the length of his probation would be determined by MTSA's Progressions Committee, which is "an ongoing committee [that] meets regularly to determine students' progress within the program." (*Id.* ¶ 8; Doc. No. 40-7 at 23.) The letter included a passage discussing Allen's situation, his upcoming rotation, and how the probation would be administered:

> You admitted to currently having significant stressors in your personal life. I commend you on your willingness to seek counseling . . . to manage those stressors. As you are aware, your next rotation is scheduled to be in the Simulation Lab. During the simulation rotation, I will arrange time for remediation while on campus to work on your clinical deficiencies. To be removed from probation, you must show marked improvement in the areas listed above. In addition, you are required to submit a daily clinical evaluation while on probation (one clinical evaluation per day). . . .

3

> I expect to receive weekly updates, via email, from you regarding your progress while on probation.
>
> Ben, you are obviously an exceptional nurse or you would not have been admitted to MTSA. Our goal is for you to become a safe anesthesia provider. We are committed to your success and your goal to become a nurse anesthetist.

(Doc. No. 40-7 at 23–24.) The Simulation Lab, or "SimLab," is a simulated clinical environment designed to allow a student to practice skills without being in an actual clinical environment. The parties agree that the SimLab, among other things, "serves to help students remediate clinical deficiencies" and that more time in the SimLab has the potential to improve a student's clinical performance. (Doc. No. 42 ¶¶ 32–34.) As an MTSA student, Allen had 24/7 access to some aspects of the SimLab and was permitted to ask for additional time in the rest of the lab from the lab's director. (*Id.* ¶ 35; Doc. No. 35-3 at 49–50, 53–54.)

In November 2019, Allen participated in and completed the Simulation Lab rotation that Dr. Gentry had discussed. (Doc. No. 38 ¶ 21.) The next month, he had a rotation at the Jennie Stuart Medical Center ("JSMC"). During that rotation, Allen received an evaluation stating that, among other things, his "[k]nowledge base regarding regional [anatomy] is deficient" and "needs a lot of work." (*Id.* ¶ 23.) Shortly thereafter, on December 17, 2019, the Progressions Committee voted to extend Allen's probationary period until at least February 3, 2020. (*Id.* ¶ 24.) Allen received another negative evaluation later in the JSMC rotation, stating that he "struggled [with] 3 patients in a row" and, in one instance, "gave [a] dose of fentanyl that caused the patient to stop breathing," (*Id.* ¶ 27.)

Allen had "no other" issues over the course of the next few months, and, on April 21, 2020, the Progressions Committee voted to end his probation. (*Id.* ¶ 28.) On May 1, 2020, Allen sent Dr. Gentry the following email regarding his upcoming clinical work:

> Hey Dr. Gentry,

4

I hope you are doing well. I am writing you in efforts to gain some clarification about my clinical schedule especially for next week. . . . . [I]t was stated that we as a class would not be put on "breaks" when we return to Vanderbilt[.] [H]owever, after attending orientation today Carrie stated that we will be giving breaks due to the amount of cases that will be happening in the coming weeks.

I do not feel comfortable being placed on breaks, especially having not been in clinical for two months, as this is much longer than many of my colleagues. I do not feel as if I would be gaining the adequate structure nor experience just coming off of Clinical Probation with next week's schedule. Could you please look into this and let me know the next steps that I need to take in order to be successful in this next season of returning to clinical?

I look forward to hearing back from you! . . .[1]

Gratefully,

Benjamin D. Allen, SRNA

(Doc. No. 35-2 at 155.) Dr. Gentry responded, "Until we have enough places to place everyone we may have to do some breaks and preops. I am meeting [with them] this coming week about how much time." (*Id.*)

In June 2020, Allen participated in an obstetrics ("OB") rotation at VUMC. (Doc. No. 38 ¶ 30.) On June 11, 2020, the rotation's clinical coordinator, CRNA Jackie McLean Woodruff, called and emailed Dr. Gentry to inform him that Allen was exhibiting deficiencies again. (*Id.* ¶ 31.) Dr. Gentry informed Allen of the situation, and the two set up a remote meeting to discuss the matter on June 15, 2020. During the meeting, Dr. Gentry went over the complaint with Allen in detail, informed Allen that he was receiving a red card and being placed back on probation,

---

[1] Dr. Gentry testified that "breaks" refers to ordinary breaks during work duties, such as lunch breaks and other brief breaks during the day. (Doc. No. 35-2 at 106.) Allen's request is somewhat confusing, but he may have been expressing a desire not to be required to "relieve" practicing CRNAs while they took short breaks themselves, which Allen testified sometimes occurred. (Doc. No. 35-1 at 195.) It does not appear that Allen ever explained this request during his own deposition, and none of his arguments in this case directly involve the issue of "breaks." The court has nevertheless included this exchange because it includes an expression by Allen to MTSA that he was struggling.

and explained to Allen that the situation would be brought to the attention of the Progressions Committee. (*Id.* ¶¶ 32–35.)

On June 16, 2020, VUMC CRNA Nathan McMasters forwarded Dr. Gentry an email from another VUMC CRNA stating that Allen "almost pushed the Duramorph IV," which Allen has admitted "would have been a bad mistake."[2] (*Id.* ¶ 37.) That same day, McMasters emailed Allen, "You are not able to perform at the expected level and we must end this rotation for you."[3] (*Id.* ¶ 38.)

The Progressions Committee held an emergency meeting to address Allen's situation on June 23, 2020. (Doc. No. 38 ¶ 40.) The meeting included evidence presented by Woodruff, who had complained about Allen during his VUMC OB rotation. Allen, who was given no more than a day's notice of the meeting, was permitted to speak in his own defense, but he was not given the opportunity to present witnesses. (Doc. No. 42 ¶¶ 40–49.) The Committee voted unanimously to dismiss him from MTSA's program. (Doc. No. 38 ¶¶ 41–42.) MTSA has an Appeals Committee with the power to overrule determinations by the Progressions Committee, and Allen pursued such an appeal. On July 28, 2020, the Appeals Committee held a hearing on Allen's

---

[2] "Duramorph" is a brand name for morphine, and "IV-push" is a "method, whereby [a] drug is injected directly into a patient's vein," as opposed to "the 'IV-drip' method, whereby the drug is introduced into a saline solution in a hanging intravenous bag and slowly descends through a catheter inserted in a patient's vein" or some other method of inserting a drug. *Wyeth v. Levine*, 555 U.S. 555, 559 (2009). What McMasters was saying, then, was that Allen nearly administered a dose of morphine in an improper manner. Allen testified that that is untrue and that the situation was based on a misunderstanding of what Allen was doing while trying to access the correct tube. (*See* Doc. No. 35-1 at 226.)

[3] MTSA has provided a report from its anticipated expert witness, CRNA Andrew Rice, describing, among other things, errors that Allen allegedly made during the VUMC OB rotations, including "intentionally attempt[ing] to enter the incorrect spinal space with a large needle which would have resulted in serious complications" and, in another incident, "abandon[ing] his patient and return[ing] to the breakroom" despite having been instructed to "stay with the patient for close observation." (Doc. No. 35-6 at 147–48.) Allen disputes many aspects of his alleged deficiencies.

6

case, at which Allen was represented by counsel. The Appeals Committed voted unanimously to affirm the Progressions Committee's decision. (*Id.* ¶¶ 42–44.)

On October 20, 2020, Allen filed a Complaint against MTSA in this court. (Doc. No. 1.) The Complaint states five counts. Count I is for violation of Title III of the Americans with Disabilities Act. (*Id.* ¶¶ 55–68.) Count II is for violation of Section 504 of the Rehabilitation Act of 1973. (*Id.* ¶¶ 69–72.) Count III is for MTSA's failure to "provide due process," although the text describing Count III does not explain the source of the due process rights being asserted. (*Id.* ¶¶ 73–82.) Count IV is for breach of contract, and Count V is for violation of the closely related implied covenant of good faith and fair dealing. (*Id.* ¶¶ 83–98.) Allen seeks both money damages and reinstatement into MTSA. (*Id.* at 22–23.)

## II. Relevant MTSA Policies and Handbook Provisions

It is undisputed that Allen's enrollment gave rise to a contractual relationship between him and MTSA. (Doc. No. 42 ¶ 4.) The Sixth Circuit has recognized that, when a student and an educational institution form a contractual relationship governed by Tennessee law, the underlying contractual duties may—but do not necessarily—include obligations set forth in a student handbook or similar policy document. *See Atria v. Vanderbilt Univ.*, 142 F. App'x 246, 255 (6th Cir. 2005) ("Though Vanderbilt's Student Handbook . . . is not an express written contract, its provisions may be enforced in Tennessee if it creates an implied contract." (citations omitted)); *see also Doe v. Belmont Univ.*, 334 F. Supp. 3d 877, 890 (M.D. Tenn. 2018) (Crenshaw, C.J.) (collecting cases). Based on that principle, Allen has identified a number of provisions of MTSA's 2020 Student Handbook (Doc. No. 35-8 at 5–160 (hereinafter, "Handbook")) that are, he argues, relevant to his dealings with the school.

7

The Handbook included a "Nondiscriminatory Policy," identified as MTSA Policy

3.2.104, which provided as follows:

> MTSA admits students without regard to race, color, sex, age, disability, marital status, full- or part-time status, religion, sexual orientation, gender identity, or national origin to all the rights, privileges, programs, and activities generally accorded or made available to students at the School. MTSA does not discriminate on the basis of race, color, sex, age, disability, marital status, full- or part-time status, religion, sexual orientation, gender identity, or national origin in administration of its educational policies, admission policies, grant and loan programs, or any other School-administered programs. The School will make reasonable accommodation wherever necessary for all applicants with disabilities, *provided that the individual is otherwise qualified to safely perform the duties and assignments connected with requirements of the curriculum.*

(Handbook at 9 (emphasis added).)

The Handbook included a written Grading Policy explaining that "[a]dvancement of each student to the next semester is made by the Progressions Committee, with faculty recommendation, at the end of each semester." (*Id.* at 41.) The Grading Policy described the grading system for both academic and clinical work and included a discussion of failed clinical rotations:

> Any failure of a clinical rotation will be reviewed by the Program Administrator and Progressions Committee for determination of remediation, or up to and including dismissal from the program. If the student remains in the program, any failed clinical rotation will be repeated and must be successfully completed (grade of B or greater) prior to graduation.
>
> Any student who earns a C for the semester clinical grade will be placed on Clinical Probation.
>
> The length of the probation will be determined by the Progressions Committee, as well as any remediation plan.
>
> Any student who earns a C for a single clinical rotation will be required to meet with the Program Administrator for determination of a remediation plan and may be placed on Clinical Probation. The student will also be referred to Progressions Committee for further review.

(*Id.* at 42.)

8

A later section titled "Actions Which May Be Recommended by Progressions Committee" included, among other things, this description of probation:

> Probation means that a student is permitted to remain at the School or clinical affiliate on a probationary status. If a student is found responsible for a similar violation during probation, the student may be suspended or dismissed. Other conditions of probation are specific to the individual case and may include loss of eligibility to serve on School committees or participate in specified School activities. Any probation for any cause will be reflected on the permanent transcript. Students who are placed on any type of probation greater than two (2) times will be dismissed from the program. An active vote to carry probation over to another term will count as an additional probation. Students' clinical probationary status will be made known to clinical coordinators where the student is scheduled to affiliate.

(*Id.* at 74.)

Among the steps described as available to the Progressions Committee in its dealings with students placed on clinical probation was the extension of the student's time in the MTSA program:

> Any student having been placed on a clinical probation may be extended in the program. The duration of such an extension will be determined by the Progressions Committee. Second year students participate in specialty rotations (i.e., cardiovascular, pediatrics, obstetrics), and if their clinical progress prohibits their full participation in specialty areas, they will need to extend in the program to complete these rotations. The length of the extension in the program, due to inadequate clinical progress in a specialty rotation, will also be determined by the Progressions Committee.

(*Id.* at 75.) Regarding dismissal, the Handbook stated the following:

> Permanent dismissal means that a student [is] permanently barred from readmission to the School. This penalty is used when the violation of one or more of the Standards of Conduct is deemed so serious as to warrant a total and permanent disassociation from the School community.

(*Id.* at 74.)

The Handbook included a discussion of yellow cards and red cards, including the following discussion of red cards:

9

The final card developed is a "Critical Incident Card" (red card). Instructors determining that the student's level of performance is below that level acceptable for this stage in the program according to the Semester Objectives on the back of the card, and that the performance could or would have caused significant morbidity or mortality without intervention, are asked to complete this card. . . . To receive a Critical Incident Card is very serious. Any student receiving a Red Card may be required to complete a drug screen within 24 hours of the school receiving notice of the Red Card. At the NAP council and end of semester Progressions Committee meeting, all Critical Incident Cards will be discussed. Each student's end of semester performance at each affiliate is discussed in the Progressions Committee meetings.

Receipt of Critical Incident Cards can lead to probation, suspension, or *in extreme cases, such as an affiliate site's refusal to allow the student to continue in that rotation, or failure of a Rotations[,] may lead to termination from the program.*

(*Id.* at 99 (emphasis added).)

Finally, Allen draws the court's attention to a number of policies that MTSA *did not* have. For example, MTSA had no "office of disability services or a disability coordinator." (Doc. No. 42 ¶ 21.) There was no "specific person in charge of [a] disability program." (*Id.* ¶ 20.) One faculty member, Dr. Maria Overstreet, was the "'primary person' in charge of assisting students with disabilities," but Dr. Gentry never informed Dr. Overstreet of any discussions he had with Allen regarding Allen's ADHD or requests for assistance. (*Id.* ¶¶ 23, 25.)

At the relevant times, MTSA had "no specific form for reporting a disability." (*Id.* ¶ 18.) Dr. Taylor was unable to testify, during her deposition, "regarding the steps when a student reports a medical condition that could trigger application of the ADA." (*Id.* ¶ 22.) The parties agree that Allen was never evaluated by MTSA for a potential accommodation and that no accommodations were recommended for him. (*Id.* ¶ 28.)

## II. LEGAL STANDARD

Rule 56 requires the court to grant a motion for summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(a). If a moving defendant shows that there is no genuine issue of material fact as to at least one essential element of the plaintiff's claim, the burden shifts to the plaintiff to provide evidence beyond the pleadings, "set[ting] forth specific facts showing that there is a genuine issue for trial." *Moldowan v. City of Warren*, 578 F.3d 351, 374 (6th Cir. 2009); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). "In evaluating the evidence, the court must draw all inferences in the light most favorable to the non-moving party." *Moldowan*, 578 F.3d at 374 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).

At this stage, "'the judge's function is not . . . to weigh the evidence and determine the truth of the matter, but to determine whether there is a genuine issue for trial.'" *Id.* (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). But "[t]he mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient," and the party's proof must be more than "merely colorable." *Anderson*, 477 U.S. at 249, 252. An issue of fact is "genuine" only if a reasonable jury could find for the non-moving party. *Moldowan*, 578 F.3d at 374 (citing *Anderson*, 477 U.S. at 252).

## III. ANALYSIS

### A. Discrimination Claims (Counts I & II)

Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . . ." 29 U.S.C. § 794(a). Title III of the ADA states that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or

11

accommodations of any place of public accommodation . . . ." 42 U.S.C. § 12182(a). "Public accommodation" is defined to include "postgraduate private school." 42 U.S.C. § 12181(7)(J). The parties agree that MTSA is subject to those provisions and that the same standard governs Allen's claims under either statute for the purposes of liability. *See Shaikh v. Lincoln Mem'l Univ.*, 608 F. App'x 349, 353 (6th Cir. 2015) ("Claims brought under the Rehabilitation Act are generally reviewed under the same standards that govern ADA claims.") (citing *Jakubowski v. Christ Hosp., Inc.*, 627 F.3d 195, 201 (6th Cir. 2010)). For brevity, the court will focus on the ADA.

"To establish that he was dismissed from an academic program in violation of the ADA or Rehabilitation Act, a plaintiff must show that (1) he is . . . disabled, (2) he is 'otherwise qualified' to continue in the program, and (3) he was dismissed on the basis of his . . . disability." *Id.* at 353 (citing *Kaltenberger v. Ohio Coll. of Podiatric Med.*, 162 F.3d 432, 435 (6th Cir. 1998)). Allen does not argue that he was terminated from MTSA based on any conscious desire by the school's administration to exclude individuals with ADHD and/or anxiety from its program. Rather, he relies on the well-established principle that the ADA requires regulated entities to grant reasonable accommodations to otherwise qualified individuals whose disabilities interfere with their access. *See id.* MTSA does not dispute that it generally has such an obligation or that an ADHD-related disability might give rise to an enforceable right to a reasonable accommodation.[4] MTSA argues instead that Allen has no claim under the ADA because, among

---

[4] Allen attempts to manufacture a dispute regarding this latter point by pointing to testimony by some MTSA personnel regarding whether ADHD "is a disability." (*See* Doc. No. 37 at 3.) MTSA's actual positions taken in this litigation, however, are consistent with the established rule that, although "ADHD is not a disability *per se*"—that is, a mere diagnosis of ADHD cannot be *assumed* to present a disability— an individual plaintiff's ADHD symptoms may support a finding of disability under the statutory definition set forth in the ADA based on an individualized assessment of the facts. *Knapp v. City of Columbus*, No. C2-CV-01-255, 2005 WL 6168484, at *9 (S.D. Ohio Feb. 16, 2005), *aff'd*, 192 F. App'x 323 (6th Cir. 2006); *see Son v. Baptist Healthcare Affiliates, Inc.*, No. 3:14-CV-337-GNS, 2015 WL

other things, he did not take sufficient steps to inform the school of his supposed need for an accommodation.

An educational institution "is not required to provide accommodation to a student under the ADA or Rehabilitation Act until the student provides a proper diagnosis of his claimed disability and specifically requests an accommodation." *Newell v. Cent. Michigan Univ. Bd. of Trustees*, No. 20-1864, 2021 WL 3929220, at *8 (6th Cir. Sept. 2, 2021) (quoting *Shaikh*, 608 F. App'x at 353). It is undisputed that Allen never explicitly said "I need an accommodation under the ADA" or anything comparably unambiguous to anyone at MTSA. The caselaw governing accommodation requests, however, is clear that he was not required to do so.[5] A disabled person "need not use the magic words 'accommodation' or even 'disability'" in order to be entitled to consideration of his request. *Leeds v. Potter*, 249 F. App'x 442, 449–50 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). All that is required is that he seek some action to enable his access or participation and that it be "clear from the context that [his request] is being made in order to conform with existing medical restrictions." *Leeds v. Potter*, 249 F. App'x 442, 449–50 (6th Cir. 2007) (citing *Smith v. Henderson*, 376 F.3d 529, 535 (6th Cir. 2004)). "What matters under the ADA," at least with regard to the initial notice of a disability and the request for accommodation, "are not formalisms about the manner of the request, but whether the [disabled person] provides the [regulated entity] with enough information that, under

---

5305235, at *3 (W.D. Ky. Sept. 10, 2015) (explaining the relationship between a diagnosis of a condition and a legal finding of disability).

[5] The requirement, under Title III, that the plaintiff request an accommodation is similar, at least in its broad strokes, to the requirement, in employment-based ADA claims, that the disabled employee "must initiate the interactive process" of evaluating whether a reasonable accommodation is possible. *Vaughn v. Parkwest Med. Ctr.*, 716 F. App'x 428, 434 (6th Cir. 2017) (citing *Gantt v. Wilson Sporting Goods Co.*, 143 F.3d 1042, 1046 (6th Cir. 1998)). The court will therefore consider caselaw on that issue as instructive, alongside Title III caselaw that is directly on point.

the circumstances, the [entity] can be fairly said to know of both the disability and desire for an accommodation." *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 313 (3d Cir. 1999).

Allen argues that his communications with Dr. Gentry and Dr. Taylor were sufficient to give rise to a duty to initiate an accommodation process, particularly in light of the fact that they were aware of his diagnosis. Allen is, however, unable to point to any particular communication in which he clearly requested an accommodation to deal with a symptom of his medical condition. At most, he requested "help" and not to be "placed on breaks," but he did so without linking his difficulties to ADHD or proposing a particular medical accommodation. Indeed, when he did raise issues, he often expressly cited factors other than ADHD, such as stress or his extended absence from clinical work. Allen's reading of the law would, in effect, require school administrators to simply assume that any academic difficulty experienced by an individual with ADHD was a result of the condition and, effectively, a request for accommodation. Neither the caselaw governing accommodation requests nor the text of the relevant statutes supports such a position.

Nevertheless, Allen now, after the fact, suggests that he was effectively seeking assistive remediation of his performance deficiencies through the SimLab due to his ADHD. No such request appears in his actual statements, however. Moreover, all of the evidence presented to the court suggests that Allen could have used the SimLab as much as he believed was necessary already, without an accommodation. If Allen had told someone at MTSA that, due to his ADHD, he needed more SimLab time, and MTSA had refused to comply, that might well have been an ADA violation. But Allen made no such request, and there was no such refusal.

In an attempt to salvage his claim, Allen points to various deficiencies in MTSA's structures for ensuring ADA compliance, as well as instances in which deposed members of

14

MTSA's faculty appeared ignorant of particular ADA- or disability-related facts. Allen's only claims, though, are based on whether MTSA violated the ADA or Section 504 in relation to him. Neither Allen nor this court has the power to engage in an open-ended audit of MTSA's general compliance. Whether or not MTSA's structures could be better or its faculty could be more knowledgeable regarding disability, what matters, for the purposes of the pending motion, is whether Allen has identified facts sufficient to support a finding of a violation of his own rights under the ADA and/or Rehabilitation Act. Because he has not, the court will grant summary judgment as to Counts I and II.[6]

**B. Contract/Due Process Claims (Counts III–V)**

### 1. Due Process (Count III)

Allen's briefing, like his Complaint, discusses "due process" without explaining why MTSA, as a private institution, had any obligation to comply with the full range of obligations that due process imposes on government actors. Allen also does not explain what type of cause of action he envisions Count III, which alleges such a violation, to be. The court most often hears due process arguments under 42 U.S.C. § 1983, but Allen does not—and could not plausibly— argue that that statute applies to a private entity such as MTSA. *See Est. of Romain v. City of Grosse Pointe Farms*, 935 F.3d 485, 491 (6th Cir. 2019) ("[N]either the Fourteenth Amendment nor § 1983 regulates private actors.") (citations omitted).

As far as the court can tell, Allen's due process arguments, to the extent that they are cognizable at all, are simply an extension of his claims that MTSA violated its contractual duties to him and/or failed in its duty to engage in good faith and fair dealing in the performance of those duties. The court, accordingly, will grant MTSA summary judgment as to Count III and

---

[6] Because the court concludes that Allen did not sufficiently inform MTSA of his need for a disability-related accommodation, the court will not consider whether any particular hypothetical accommodation would have been reasonable.

15

focus on Counts IV and V—with the understanding that many of the arguments that Allen advanced in support of Count III may buttress those claims as well.

### 2. Breach of Contract (Count IV)

#### a. Applicable standard

In Tennessee, a claim for breach of contract has three essential elements: (1) the existence of an enforceable contract; (2) nonperformance amounting to a breach of that contract and (3) damages caused by the breach. *Ingram v. Cendant Mobility Fin. Corp.*, 215 S.W.3d 367, 374 (Tenn. Ct. App. 2006). The first element is undisputed in this case, in that the parties agree that there was some manner of enforceable contractual relationship between Allen and MTSA. The parties disagree, however, about the scope of MTSA's contractual duties and, by extension, what would amount to a breach of those duties.

That disagreement exists in part because the Tennessee law of contract pertaining to students and private educational institutions, as interpreted by the Sixth Circuit, is more flexible—and consequently more ambiguous—than the approach that courts take to most ordinary contract disputes. *See Atria.*, 142 F. App'x at 255 ("This court, applying Tennessee's law, has stated that 'the student-university relationship is contractual in nature although courts have rejected a rigid application of contract law in this area.'") (quoting *Doherty v. S. Coll. of Optometry*, 862 F.2d 570, 577 (6th Cir. 1988)). Pursuant to that flexible framework, "[c]atalogs, manuals, handbooks, bulletins, circulars and regulations of a university may help define this contractual relationship," but they are not necessarily entitled to word-by-word enforcement in and of themselves. *Id.* at 255 (citing *Ross v. Creighton Univ.*, 957 F.2d 410, 414 (7th Cir. 1992)). Complicating matters further, that already-flexible framework may be more or less "intrusive,"

depending on whether the underlying dispute is "disciplinary" or "academic," with academic determinations receiving a greater level of deference. *Id.* (quoting *Doherty*, 862 F.2d at 577).

In theory, clinical settings such as Allen's rotations in working hospitals have the capacity to blur academic and disciplinary issues. The Sixth Circuit, however, has directly considered that ambiguity and concluded that, at least in the context of "curriculum decisions,"

> judicial deference to educators . . . is no less applicable in a clinical setting [than in the classroom,] because evaluation in a clinical course 'is no less an 'academic' judgment [simply] because it involves observation of . . . skills and techniques in actual conditions of practice, rather than assigning a grade to . . . written answers on an essay question.

*Doherty*, 862 F.2d 576–77 (*quoting Bd. of Curators of Univ. of Missouri v. Horowitz*, 435 U.S. 78, 95 (1978) (Powell, J., concurring)). The court sees no reason why this case should be governed by any different standard. The issues raised by the underlying facts are inescapably academic. Allen was not dismissed simply because he engaged in some type of bad behavior, but because he had repeatedly failed to progress toward the ultimate academic goal of becoming sufficiently competent in the skills required of anesthesia practice to engage in that practice safely and effectively. Inserting the judgment of the court into the training process designed and executed by professional educators and healthcare providers would be a significant step, particularly in light of the life-or-death stakes of the underlying clinical responsibilities. The Sixth Circuit has warned that such "judicial intervention" in the academic process "should be undertaken only with the greatest reluctance."[7] *Doherty*, 862 F.2d at 576 (citing *Regents of Univ. of Mich. v. Ewing*, 474 U.S. 214, 226 (1985)).

---

[7] Allen argues that the deference afforded to academic determinations should not apply here, because he is not asking the court to substitute its judgment for MTSA's as to the ultimate question of whether he should advance in the CRNA program, but rather merely to require MTSA to follow appropriate procedures for whatever decision it does make. Any ruling in Allen's favor, however, would necessarily require concluding that MTSA's already-enacted academic decision was erroneous, even if only

Of course, merely saying that a more flexible standard applies to a particular type of claim leaves open the question of what precisely that more flexible standard is. MTSA urges the court to apply a standard based on some language set forth by the District Court for the Eastern District of Tennessee in *Sifuna v. South College of Tennessee, Inc.*, No. 3:14-CV-00515, 2017 WL 2062878 (E.D. Tenn. May 12, 2017):

> Generally, a court should not disturb a university's academic decisions unless the university acted in an arbitrary and capricious manner. In order to establish such arbitrary and capricious action, a plaintiff must show that there is no rational basis for the university's decision or that the decision was motivated by bad faith or ill will unrelated to academic performance. Judicial intervention in any form should be undertaken only with the greatest reluctance. This is the case especially regarding degree requirements in the health care field when the conferral of a degree places the school's imprimatur upon the student as qualified to pursue his chosen profession.

*Id.* at *5 (citations and internal quotation omitted), *aff'd*, No. 17-5660, 2018 WL 3005814 (6th Cir. Apr. 5, 2018). While that language satisfies the Sixth Circuit's requirement to provide deference to educational institutions, it is also vulnerable to the critique that such a standard, taken alone, is so focused on deference that it ceases to resemble a breach of contract action at all—substituting a form of easy-to-survive general judicial review of all academic decisions in the place of considering the specific promises at issue.

The Sixth Circuit has suggested that, while significant deference is appropriate, a court should still keep the actual contractual provisions at issue close in mind, with a focus on the student's "reasonable expectation" based on the institution's representations in the relevant handbook, catalog, or other document. *Doherty*, 862 F.2d 570, 577 (6th Cir. 1988) (quoting *Lyons v. Salve Regina Coll.*, 565 F.2d 200, 202 (1st Cir. 1977)). The court, accordingly, will not go so far as to say that all that matters is whether MTSA acted arbitrarily and capriciously. It

procedurally. It would, therefore, involve interfering in an academic judgment and raise all the same issues counseling deference.

18

may also be possible for Allen to prevail by showing that MTSA departed substantially from a reasonable expectation of its obligations under the Handbook, in a manner that resulted in damages to him as a student.

<u>b. Alleged breaches of contract</u>

Allen's breach of contract allegations generally fall into two categories: those related to MTSA's failure to provide him with accommodations and those related to MTSA's supposed failure to adhere to the procedural guarantees set out in its Handbook. With regard to the first of those sets of allegations, Allen relies on the Handbook's stated commitment to providing reasonable accommodations set forth in MTSA Policy 3.2.104. He does not identify any basis, however, for construing that provision to require MTSA to engage in an affirmative process of identifying needed accommodations in excess of what is required under the ADA. Undoubtedly, a school *could* assume such a contractual obligation; schools that provide general education to minors are, in fact, required by law to engage in affirmative disability-identification efforts, *see M.G. ex rel. C.G. v. Williamson Cnty. Sch.*, 720 F. App'x 280, 284 (6th Cir. 2018) (discussing 34 C.F.R. § 300.111), and a similar obligation could presumably be included in a contract involving an adult student. At the summary judgment stage, however, what matters is not what could happen but what did happen, and nothing in the Handbook or any other potential source of a binding contractual duty suggests that MTSA, a private institution teaching adults, assumed such a responsibility. Rather, the plainest reading of the brief mention of accommodations in the Handbook is that MTSA had, at most, a duty to comply with obligations roughly parallel to those set forth in the ADA and its accompanying caselaw, from which the Handbook appears to have borrowed its terminology. There is therefore no basis for concluding that the Handbook created a reasonable expectation that MTSA would engage in efforts to identify student disabilities above

19

and beyond what the ADA requires. Accordingly, MTSA is entitled to summary judgment with regard to Allen's accommodations-based breach of contract claim, for the same reasons it is entitled to summary judgment on Counts I and II.

Allen's procedurally focused breach of contract allegations are scattershot, but he focuses in particular on the facts that (1) he was not permitted to extend his enrollment at MTSA beyond the time usually required to complete the required work, as an alternative to being dismissed, and (2) he was not afforded a greater opportunity to defend himself before the Progressions Committee, including by receiving adequate notice of the allegations against him and by presenting his own witnesses. With regard to the first of those arguments, Allen relies on the statement in the Handbook that "[a]ny student having been placed on a clinical probation may be extended in the program." (Handbook at 75.) He suggests that the use of "any" should be read to establish that MTSA was required to offer Allen, or any other similarly situated student, an opportunity to extend his education rather than being dismissed.

At most, though, that is simply one (arguably) plausible reading of the underlying language. The same passage, however, also conspicuously uses the word "may," which is suggestive of a permissive option, not an obligation. A reading of the Handbook as a whole, moreover, is not consistent with a reasonable expectation that every student who experienced clinical difficulties had a categorical right to be extended in the program in lieu of dismissal. Such a rule would, among other things, have been inconsistent with the fact that the Handbook expressly identified certain situations in which immediate dismissal could occur. Indeed, at least two such situations were applicable to Allen, if not more. First, he received more than two instances of probation, as that figure is calculated pursuant to the Handbook. (*See* Doc. No. 35-2 at 83; Handbook at 74.) Second, he received a red card followed by a decision to terminate his

VUMC OB rotation. (*See* Handbook at 99.) Allen cannot plausibly argue that the Handbook gave him a reasonable expectation that MTSA would necessarily extend, rather than dismiss, him in those situations, given that that very same Handbook expressly identified the situations as occasions that might warrant immediate dismissal.

More broadly, the Handbook's overall discussion of the Progressions Committee's responsibilities is consistent with the reading that it possessed reasonable discretion in selecting the consequences for deficient clinical performance, not that it was constrained from dismissing a student until after giving that student an extension. MTSA is therefore entitled to summary judgment on any breach of contract claim based on the decision to dismiss, rather than extend, Allen.

Allen's argument that he was entitled to greater procedural protections is similarly unsupported by the actual terms of the Handbook. Allen has not been able to identify any Handbook provision that would have given a student the reasonable impression that he would be entitled to the kind of enhanced procedures that Allen desires. Rather, Allen relies, for the most part, on a general assumption that MTSA had an obligation to treat him fairly, which he believes it did not. Such broad notions of fairness, however, are inappropriate for an ordinary breach of contract claim, particularly under the deferential standard applicable to academic cases. Such arguments, insofar as they are cognizable at all, fit far better under the rubric of the implied covenant of good faith and fair dealing, as the court will discuss. On the question of ordinary breach of contract, however, Allen has failed to identify a sufficient basis for a finder of fact to conclude that he should prevail. The court will therefore grant MTSA summary judgment as to Count IV.

21

### 3. Breach of the Implied Covenant of Good Faith and Fair Dealing (Count V)

It is well-settled in Tennessee that "there is implied in every contract a duty of good faith and fair dealing in its performance and enforcement." *Wallace v. Nat'l Bank of Commerce*, 938 S.W.2d 684, 686 (Tenn. 1996) (quoting *Covington v. Robinson*, 723 S.W.2d 643, 645–46 (Tenn. Ct. App. 1986)). The Tennessee Supreme Court has suggested that one way to look at this duty is by "allowing the qualifying word 'reasonable' and its equivalent 'reasonably' to be read into every contract." *Dick Broad. Co. of Tenn. v. Oak Ridge FM, Inc.*, 395 S.W.3d 653, 661 (Tenn. 2013) (citing *Pylant v. Spivey*, 174 S.W.3d 143, 152 (Tenn. Ct. App. 2003); *Hathaway v. Hathaway*, 98 S.W.3d 675, 678–79 (Tenn. Ct. App. 2002); *Hurley v. Tenn. Farmers Mut. Ins. Co.*, 922 S.W.2d 887, 892 (Tenn. Ct. App. 1995)).

The duty imposed by the implied covenant of good faith and fair dealing is famously narrow, and courts routinely warn parties that the doctrine should not be thought of as "an independent basis for relief," separable from the contract into which the implied covenant has been read. *Thomas v. Meharry Med. Coll.*, 1 F. Supp. 3d 816, 829 (M.D. Tenn. 2014) (quoting *Shah v. Racetrac Petroleum Co.*, 338 F.3d 557, 572 (6th Cir. 2003)); *accord LeBlanc v. Bank of Am., N.A.*, No. 2:13-CV-02001-JPM, 2013 WL 3146829, at *14 (W.D. Tenn. June 18, 2013); *Upperline Equip. Co. v. J & M, Inc.*, 724 F. Supp. 2d 883, 892 (E.D. Tenn. 2009). That said, it is a mistake to assume, as MTSA seems to, that, simply because the implied covenant of good faith and fair dealing is not an *independent* duty, it is not a *distinct* one. (*See* Doc. No. 34 at 11 ("[B]ecause Allen's breach of contract claim fails, this claim fails too.").) If the implied covenant of good faith and fair dealing added nothing to a contract, it would mean that there is really no

such thing as a meaningful doctrine of the implied covenant of good faith and fair dealing at all—contradicting reams of well-settled Tennessee caselaw.

The implied covenant of good faith and fair dealing may not be separable from the underlying contract at issue, but that does not mean it is useless or vestigial. What the implied covenant of good faith and fair dealing provides is a distinct rationale for recovering under a contract based not on the literal violation of a contractual term but on a party's failure to perform its contractual obligations reasonably and in good faith. *See* Williston on Contracts § 38:12 (4th ed.). It is no defense to such a claim to argue that the defendant technically complied with a contract's express, literal provisions. Preventing a party who agreed to a contract from frustrating the purposes of that contract while hiding behind a bad-faith facade of technical, literal compliance is exactly what the duty of good faith and fair dealing is intended to prevent.

The duty of good faith and fair dealing is, moreover, "particularly important where . . . one party possesses a unilateral right to impose serious costs on or otherwise adversely affect the other party to the contract." *Coleman v. Wells Fargo Banks, N.A.*, 218 F. Supp. 3d 597, 607 (M.D. Tenn. 2016) (Crenshaw, C.J.) (collecting cases). For example, the Sixth Circuit has recognized that, where an arbitration agreement grants one party a unilateral power to amend the applicable procedures, the "duty of good faith and fair dealing prohibits it from amending the [p]rocedure[s] for an improper or oppressive purpose." *Howell v. Rivergate Toyota, Inc.*, 144 F. App'x 475, 479 (6th Cir. 2005) (citing *Elliott v. Elliott*, 149 S.W.3d 77, 84–85 (Tenn. Ct. App. 2004)). In contractual relationships that, by choice or necessity, leave some room for discretion, the duty of good faith and fair dealing may be all that prevents that grant of discretion from creating an unfair—and perhaps even unconscionable—power of one party to heap bad-faith

23

abuse upon the other. *See id.* (observing that the duty of good faith and fair dealing prevented the unilateral amendment term from being unconscionable).

Allen is correct to observe that his relationship with MTSA is of the type in which the covenant of good faith and fair dealing is particularly important. The inherent structure of the pedagogical relationship granted MTSA a great deal of power over Allen, and the flexible nature of the law in this area permitted MTSA considerable discretion in its exercise of that power. Under Tennessee law, the implied covenant of good faith and fair dealing imposed an outer boundary on that discretion beyond the bare obligation to comply with the literal edict of any particular contractual provision. If Allen had identified evidence sufficient to permit a finder of fact to conclude that MTSA exceeded those boundaries of reasonableness and good faith, it would be appropriate to allow Count V to proceed to trial.

The evidence on which Allen relies, however, is insufficient. While MTSA could have been more lenient on and patient with Allen, it also could reasonably have been harsher and more decisive—particularly in light of the serious patient safety issues that arose during his clinical rotations. Allen may well be correct that MTSA's hearing procedures—particularly its limitations on a student's ability to provide evidence in his defense—fall short of what would be required in some other settings, including those involving government deprivations of property rights or liberty interests. Nothing in the Handbook, however, would have given a student a reasonable expectation that such heightened procedural safeguards would exist. There is no evidence, moreover, that the MTSA administrators ever acted in bad faith or otherwise behaved in a manner inconsistent with the reasonable expectations that one would have drawn from the Handbook itself.

As the plaintiff, Allen had the obligation not simply to identify a legal basis by which a school in MTSA's position might be liable for violating its implied duties, but to identify evidence sufficient to permit such a conclusion at trial in this case. Because he has not done so, the court will grant MTSA summary judgment as to Count V.

## IV. CONCLUSION

For the foregoing reasons, MTSA's Motion for Summary Judgment (Doc. No. 33) will be granted in favor of MTSA on all counts.

An appropriate order will enter.

_____
ALETA A. TRAUGER
United States District Judge